390 S.W.2d 116 (1965)
A and B, Appellants,
v.
C and D, Appellees.
No. 5-3514.
Supreme Court of Arkansas.
May 10, 1965.
Rehearing Denied June 7, 1965.
James L. Sloan, Little Rock, Leon Lusk, Houston, Tex., for appellants.
Smith, Williams, Friday & Bowen, by Robert V. Light, Little Rock, for appellees.
HARRIS, Chief Justice.
This appeal questions the validity of an adoption. As a matter of considering the welfare of the child involved, and in keeping with the spirit of the adoption law, the litigants will not be referred to by name, but rather, letters of the alphabet will be used in discussing the facts. B is the natural mother of the child, a female infant, hereinafter called E. A is the husband of B. C and D are the adoptive parents of E. On January 24, 1951, C and D obtained a temporary order of adoption of E in the Probate Court of Pulaski County on the basis of a petition alleging that E was the illegitimate child of B, having been born on January 18, 1961, at a Little Rock hospital. Filed with the petition was a "Consent of Adoption," executed by B before a Notary Public, and reciting that B had given birth to E; that E was illegitimate, and that B waived all rights to E, and *117 waived service of process and notice of hearing. A final order of adoption was entered on July 25, 1961. On June 26, 1963, B, joined by A, whom she had met, and married in Texas, in June, 1962, filed a petition to vacate the adoption on the basis of fraud and unavoidable casualty, and C and D responded with a general denial, also asserting that the period of limitation (Ark. Stat.Ann. § 56-112 [1947]) had expired prior to the commencement of the action. After hearing testimony, the Probate Court of Pulaski County (Second Division) entered its order, dismissing the petition (as amended), and finding, inter alia, that B, at the time of executing the consent of adoption was of full legal age, of sound mind, and possessed the capacity to exercise her normal mental faculties. "She was not, at this time, under the influence of any drugs that would affect her ability to understand the nature of her acts." The court further found that no fraud was perpetrated by any person in connection with execution of the consent, "nor was there any overreaching by any person dealing with her in this connection." From the judgment so entered, appellants bring this appeal.
The core, or essence, of this litigation is the contention of appellants that the consent of adoption was signed by B not long after she had given birth to E, and at a time when she was hospitalized, under the influence of drugs, and in a distressed mental and emotional state. It is asserted that she was told by some individual, whom she understood to be a member of the hospital staff, or a physician, that her baby had died, and she would be required to sign some papers in connection with the death; that when signing the consent, she was not aware that she was consenting to the adoption of E, nor aware that she was waiving any of her rights as the natural mother. According to her testimony, B, in 1960, was employed in the bookkeeping department of a Little Rock concern. She had never been married, but discovered that she was pregnant. By wearing a tight girdle and full skirts, she concealed her condition, and continued with her duties. B received no prenatal care. On January 17, 1961, at about 11:30 P.M. she went to St. Vincent's Infirmary, accompanied by four girl friends, who were unaware of the real reason for the trip to the hospital; B told the nurse that she thought she might have appendicitis, and when a doctor came in, the girls were asked to leave. Upon examination, the physician asked if she were pregnant, and she admitted that she was, and was immediately taken to the delivery room. B stated that she received a shot, and remembered nothing else until the next day at noon, when, she stated, a white man was in her room and told her that she had a brother coming to visit her from Forrest City. She definitely placed this time as Wednesday, because she knew that the airraid siren sounded on Wednesday at noon, and the noise had aroused her. She told the man that she did not have any relatives in Forrest City, and remembered nothing further until late in the afternoon, when Bonita Haston (since married, and now named Griffith), a friend, came to visit. According to B, it was dark in the room by that time, and a man came in and told her that her baby had died. She was unable to describe the man, but remembered that he said there would be some papers for her to sign in order to give the hospital the authority to make an autopsy. She stated that she felt sleepy, as she termed it, "druggy." This occurred on January 18. The witness stated that on the 19th, a nurse came into the room and gave her some pills, and perhaps a shot; that later, around noon, or in the afternoon, a man and woman came into the room with some papers. She testified that she was shown where to sign, and was given a pen to sign with, but that she was not advised as to the nature of the papers. It was her thought that they were the papers which had been referred to the day before. After these persons left, her boss, a Mrs. Taylor, came and visited for twenty or twenty-five minutes, asking if B *118 needed any money, and advising that she could obtain a loan, if necessary. B testified that she (B) had about $170.00 cash in her purse, and about $175.00 in the bank. On the morning of the 20th, her brother (who lived in North Little Rock) visited her, and she told him that she injured herself when falling while bowling, and this was the reason for her being in the hospital. Later, upon being advised by a nurse that she could go home, she was taken by her brother to North Little Rock. From there she went to her mother's home located in a small town in Arkansas, and stayed until the following Sunday, when she returned to Little Rock, and resumed work.
After marrying, she went to Dr. John Roberts Phillips in Houston for treatment of a cyst, and, during the examination, was asked if she had ever been pregnant. Since her husband was with her, B responded in the negative, but subsequently told Dr. Phillips that she had been pregnant, and had delivered a baby, but that it had died.[1] Upon the advice of the doctor, she revealed these facts to her husband. A insisted that they come to Little Rock to ascertain if the baby actually had died, and they employed an investigator, Reed Thompson. Later, Thompson advised them that the baby was alive, and had been adopted, but would not give any information as to the people who had obtained the adoption. A stated that Thompson suggested that B see a psychiatrist, and Thompson further stated that he had learned that B had given her consent to the adoption, and that he did not care to have anything to do with the case.
Bonita Griffith testified by deposition that on the afternoon of Wednesday, January 18, 1961, she visited B at St. Vincent's, and was in the room, when a white man, in hospital clothing, entered and told B that her baby had died, and that there would be some papers for her to sign. Mrs. Griffith stated that she had learned at B's place of employment that B was in the hospital, and she went to St. Vincent's and made inquiry. She was told that no one by that name was registered, but on confirming from the office, where B was employed, that her friend was indeed in the hospital, Mrs. Griffith stated that she went from room to room until she found B on the third floor.[2]
The Little Rock physician and obstetrician, who delivered the baby, testified that he was on the staff of St. Vincent's Infirmary, and was the physician on call for unassigned patients in obstetrics and gynecology for the month of January, 1961.[3] He stated that on the 18th, he received a call from the emergency room, and found that he had been assigned a patient who was in labor. He ascertained the name and read the information on the emergency records. This patient was B. He testified that the records reflected that she had received thorazine (a tranquilizing drug) at 1:00 A.M., and received demerol and scopolamine at 1:45 A.M., and at 3:00 A.M. He explained that the purpose of demerol is to relieve pain, and the purpose of scopolamine is to dry up secretions, so that the patient will not be likely to vomit. The doctor testified that B told him that she was unmarried, but had been able to conceal her pregnancy from her employer, parents, and friends; that she did not know exactly what she was going to do, but was considering "adopting her baby out." He said that he told her he would attempt to help arrange an adoption if she desired. The *119 baby was delivered at 9:25 A.M. on the 18th. The witness stated that he saw her again between 4:00 and 5:00 P.M. when he checked his patients at the hospital, and at that time she told him that she wished to have the baby adopted. The doctor testified that he then contacted a couple who had desired to adopt a baby, but this couple had changed their minds, and no longer desired to adopt a child. He then called an attorney, with whom he was acquainted, to ascertain if the attorney knew of a suitable couple who wished and desired an adoption. Subsequently, C and D called the doctor's office, and made an appointment to see him. Appellees went to his office, and they discussed the adoption and the usual arrangements, including financial arrangements.[4] The witness stated that he saw B each day until the day of her discharge from the hospital, which was January 21, and that, in his opinion, she was given no drugs that would have affected her at the time of the signing of the consent to adoption. He said that he advised her on Friday that the attorney would be in to see her for the purpose of getting adoption papers signed, and that she was entirely rational and lucid. The doctor testified that on the next morning (Saturday, January 21) he asked her if she had signed the papers for adoption, and she replied that she had.
Dr. Thomas H. Wortham[5] was not acquainted with B personally, and never did see her, but testified that, based upon an examination of B's records, reflecting the medication that she had received, it was his opinion that the medication would affect the reasoning process for about eight hours, and, at the most, twelve hours.
According to the Little Rock attorney, who prepared adoption papers on instructions from C and D, he proceeded on Friday, January 20, to St. Vincent's Infirmary, in the company of Mrs. Helen Ward, a secretary and Notary Public in the Attorney General's office. They entered the room which had been pointed out as the one occupied by B, the lawyer introducing himself and Mrs. Ward, and explaining the purpose of the visit. He testified that B appeared to be expecting him, and indicated that she knew who he was, and the purpose of his visit. The witness stated that he told her he represented the people who wanted to adopt her child, but that his relationship with his clients was confidential, and that if she consented to the adoption he would not be able to disclose the name of the client. He said that he also explained that he did not represent her (B) that the consent was a full and absolute consent, and that "she could not change her mind." The attorney stated that he handed her the paper, and that she looked at it for a minute or two, then signed, remarking that she thought it was best for the child. He said that B sat up in bed most of the time that he and Mrs. Ward were in the room. The lawyer further testified that Reed Thompson called and informed him that A had married a woman who had given her child for adoption, and asked if he might have the permission of the witness to tell A the name of the attorney (who had handled the adoption), and inquired whether the latter would consent to see A. After receiving permission, A made a visit to the office, and stated that his wife was very upset because she had permitted her child to be adopted; that she was under the care of a psychiatrist, and had been advised to try and get the child back. The lawyer was quite positive that A did not say that B had been informed in the hospital that her baby had died. At the request of A, a letter was directed to his clients, setting out appellants' feelings in the matter, but *120 C and D replied that they did not desire to talk with A, and felt that in remaining unidentified, the best interests of the child would be served.
Mrs. Helen Ward verified all that the attorney had said, stating that he had explained to B the meaning of the consent to adoption, and advising that it would be final. Mrs. Ward quoted B as saying that she had thought about the matter, and realized fully what she was doing; that she could not care for the baby properly, and would rather that it would be reared in a home with two parents, who could look after it, and that she was glad that a nice couple would get the baby.
The record reflects that B, while in Houston, Texas, had consulted Paul V. Ledbetter, Jr., a psychiatric social worker, and two psychiatrists. In answering interrogatories, Ledbetter stated that B did not tell him that her baby had died. He further stated that it was his understanding "that at no time did she believe the child to have died." There was no testimony from the two Houston psychiatrists.
We think the preponderance of the testimony supports the findings of the Probate Judge. In addition to the testimony, which we feel preponderates in favor of appellees, the acts of B clearly indicate that she was aware of the fact that she had consented for the child to be adopted. For instance, while stating that she was told that the baby had died, B made no inquiry about funeral arrangements, nor did she ever inquire as to where the baby was buried. Although aware of the fact that she had incurred financial obligations for medical expenses while in the hospital, and though stating that she had saved some money for this purpose, B left the hospital without consulting, or making arrangements, with any hospital authority for payment of these bills; nor did she ever make any payment. As stated, we think the evidence is convincing that B, not only did not have any fraud practiced upon her, but was also fully cognizant of the nature of the instrument executed, i. e., she was aware that she was irrevocably giving up her rights to E.
It is asserted that the Probate Court erred in receiving testimony that C and D were proper persons to rear the child. Very little evidence was offered on this point, and certainly the testimony was only incidental to the major issue. We agree that, in this particular hearing, the suitability of the adoptive parents was not in question, but we are unable to see that any prejudicial error was committed. In fact, as is known by the attorneys, this court tries Probate and Chancery cases de novo, and we think the evidence is ample to sustain the court's judgment, absent the testimony referred to.
Finally, it is urged that the consent to adoption was not properly executed. Appellants point out that the adoption statute requires a written consent, verified by affidavit, and they assert that Mrs. Ward only witnessed and acknowledged B's signature. It is true that the evidence does not reflect that B held up her hand while Mrs. Ward recited a formal oath, but we think there was substantial compliance with the statutory requirement. Mrs. Ward was present in the room; Mrs. Ward did see B sign the consent; Mrs. Ward did hear the explanation given B by the attorney representing C and D, and it is obvious that this appellant executed the instrument with the full intent to do that which is required by the statute. Ark.Stat.Ann. § 28-206 (Repl.1962) provides:
"Every affidavit shall be subscribed by the affiant, and the certificate of the officer before whom it is made shall be written separately, following the signature of the affiant."
These requirements, of course, were met in the instant case. In Cox v. State, 164 Ark. 126, 261 S.W. 303, we said:
"So, here, we think if appellant signed the affidavit for the purpose of *121 swearing to it, knowing that the clerk regarded his act of signing the affidavit as a method of making affirmation, the jury was warranted in finding that appellant was sworn."
We accordingly find no merit in this contention.
As set forth in this opinion, we, like the Probate Judge, find no fraud, or overreaching, and are convinced that the consent was obtained at a time when B was fully cognizant of the significance of her actions. Still, we think it appropriate to make some comment relative to this method of acquiring children for adoption, which has now become an established practice in some areas of the State. Acquiring a child in this manner is, most often, unwise. The natural mother, after some period of time, marries, and sets up her home, and frequently decides that she desires to have her child back. Such a situation may well mean grief, sorrow, and expense for both the mother and the adoptive parents, if the mother is able to learn the whereabouts of the child.[6] When in the hospital, though fully aware that she is giving up her child, her thinking processes may well be clouded by the nature of the predicament in which she finds herself. In addition, the general policy in such cases, which has developed over the years, of the adoptive parents paying all expenses connected with the birth of the child, is somewhat akin to the actual sale of babies, which has occurred, though, of course, unlawfully, in some sections of the country. We think constructive legislation could well be enacted in the adoption field by the General Assembly.
Finding no reversible error, the judgment is affirmed.
JOHNSON and HOLT, JJ, not participating.
NOTES
[1] Dr. Phillips, by deposition, verified that B had told him that her baby had died.
[2] The witness testified that she looked into the various rooms on the first floor, then the second floor, and repeated the process until she found B on the third floor. On cross-examination, she stated that the rooms on the first floor had patients in them. Subsequently, both local doctors, whose testimony is hereinafter discussed, stated that there are no patients on the first floor at St. Vincent's.
[3] He explained that the physician on call for unassigned patients took care of those people who came to the hospital without a doctor, who did not request a particular doctor, and who needed attention in his specialty.
[4] C, the adoptive father, paid the fee of $150.00, and also paid all hospital bills, which the doctor said was customary in this type of adoption case. "It's usually understood, as you well know, the adopting parents usually pay the expenses."
[5] C, at the suggestion of the attending physician, obtained a doctor of his choice to examine the child, before proceeding further with the adoption. He selected Dr. Wortham.
[6] In some instances, prospective adoptive parents have themselves made all arrangements, including financial, with the mother, and, of course, in all such cases, the natural parent is always aware of who has her child.